MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Harry and Marty W. to their two sons, Matthew, now age seven, and Shawn, now age five. This case began in November, 1995, with a voluntary commitment of the children to the care and custody of the Department of Children and Families (hereafter, "DCF") and on January 26, 1996, the children were adjudicated neglected and committed to DCF for a period of one year. Extensions of commitment were granted in December, 1996; November, 1997; and December, 1997. On February 20, 1997, DCF filed a petition for termination of parental rights as to Matthew and Shawn. On December 2, 1997, DCF filed an amendment to the petition.
The court finds that the mother and father have been personally served with the petition for termination, have appeared and have court-appointed attorneys. The Court has jurisdiction in this matter and there is no pending action affecting custody of the children in any other court.
By amended petition, petitioner, DCF, alleges that the grounds for termination of parental rights as to the father of both children are abandonment, failure to rehabilitate himself after a finding of neglect, and the lack of an on-going parent-child relationship. As to the mother, DCF alleges in its petition, as amended, that Matthew has been abandoned and that she has failed to rehabilitate herself after a finding of neglect; these grounds are also alleged for Shawn and, in addition, it is alleged that there is no on-going parent-child relationship. Parents have denied the charges pending against them.
FACTS
The court, having read the verified petitions, the social studies, and the various documents entered into evidence, and having heard the testimony of the witnesses and an evaluator, as well as having taken judicial notice of the prior record in this court as to both children, makes the following factual findings CT Page 6347 and reasonable inferences supported by these facts.
FATHER, HARRY W.
Father[2] was not present at the trial of this matter and was defaulted. The evidence introduced by DCF and by mother showed that father and mother were involved in domestic violence incidents in May and November, 1995. Father was incarcerated as a result of the May, 1995, incident. On January 26, 1996, father agreed to the commitment of the children to DCF. He also entered into expectations, approved by the court, which included visitation, counseling, anger management and substance abuse classes.
Father failed to comply with the expectations. Visitation occurred sporadically from January to March, 1996, when it stopped altogether, even though a bi-weekly visitation schedule had been established by DCF and an offer of transportation was made by the agency. Father had provided two gifts to the children up to March, 1996. Since this date, he has not sent any cards or gifts to the children or recognized holidays or birthdays. DCF contact from March, 1996, with father has been limited. On January 2, 1997, he told social worker Jennifer Desautels that he had his life together, was engaged to be married and was "trying to go after the boys." He also objected to the TPR petition at a hearing on March 14, 1997, stating that he was contacting an attorney to fight for reunification. He has not followed up on these assertions.
Father did not comply with his obligation to complete substance abuse treatment. He was discharged from Community Prevention and Addiction Services in Willimantic on April 17, 1996. He never gave any indication to DCF that he had completed any other substance abuse, anger management or domestic violence counseling. Both children have informed a foster caretaker that they have negative memories of father hitting them.
MOTHER, MARTY W.
Mother was herself committed to DCF for some years, due to her parents' arrest and conviction for risk of injury to minors. At age thirteen she became involved with father and began to live with him at age sixteen. They were married on April 23, 1993. Mother gave birth to Matthew at age seventeen and to Shawn at age nineteen. According to the social study as amended (Exhibit 3) at CT Page 6348 5: "Ms. [W] reports that her relationship with Mr. [W] involved serious domestic violence, that she `lived in fear,' that he harassed her, tampered with her car, forced her to have sexual relations, and was obsessed with her."
As indicated above, father was arrested on domestic violence charges in May, 1995. DCF was notified by Family Relations and began monitoring the family. The November 15, 1995, incident of domestic violence, which took place in the presence of the children, led to the arrest of both father and mother. On the following day mother voluntarily surrendered the children to DCF, so that she could "get her act together." This voluntary commitment was for a period of ninety days.
On December 22, 1995, a neglect petition was filed by DCF alleging that the boys were being denied proper care and attention, and were being permitted to live under conditions injurious to their well-being. In addition to the atmosphere of domestic violence, the petition mentioned father's arrest record and the condition of the apartment where the children resided.
Mother admitted to the petition on January 26, 1996. She entered into expectations on that date, which required continued visitation with the children, parenting, domestic violence and drug and alcohol counseling, a no-contact order as regards father, a no-substance abuse order, and an requirement of adequate income and housing.[3]
Mother was fully compliant with the expectations initially. She participated in a substance abuse evaluation at United Services, abided by treatment recommendations and participated in numerous random urine screens which tested negative for substances. She attended individual counseling at Day Kimball Mental Health Services to address mental health and personal issues. She attended and completed parenting classes at United Services, as well as the domestic violence support group at United Services. She had no contact with her husband, Harry W. during this time period. In May, 1996, she wrote a letter to DCF asking that her children be returned to her, based upon her progress.
The children were returned to her under a continued commitment to DCF on July 21, 1996. Unfortunately this reunion did not prove successful. On August 13, 1996, mother contacted DCF, reporting that she was unable to cope with the children's CT Page 6349 behavior, and was having financial difficulties and problems in securing child-care. She requested that DCF return the children to foster care. She reported also that her mental state was near breakdown. Mother testified that she had spent the last few days with the children crying and in an emotional state. The five-week trial period had indicated to mother that she could not handle the stresses of child care. DCF offered to work with her to solve some of her immediate problems by offering to pay for a week of child care and explore other child-care options and by providing mental health services relating to parenting crises. Mother turned down any limited solution, however, stating that she wanted to resolve the matter of custody permanently. The children were again placed in foster care on August 15, 1996.
Mother, according to information she supplied to DCF, had had periods before DCF involvement when her emotional state had broken down. Indeed, one of the court-ordered expectations was that she was to seek mental health counseling. While, as indicated, mother fully participated at United Services in a mental health program in the January to May, 1996, period, she did not seek any follow up treatment, as recommended by DCF. She refused to try any mental health intervention in the August, 1996, crisis. After August, 1996 she did not follow up with psychiatric evaluations conducted in January, 1997, and March, 1998. She had a breakdown in March, 1997, necessitating her hospitalization for a week, but did not continue with any medical care. The court also observed mother testify and noted the overwhelming sadness of her demeanor. Mother's fragile mental state provides one explanation for her decision in August, 1996, to contact DCF again about foster care for the children.
There was also another factor here. Mother had met within the year 1995 one P.K. Mother began living at K's home August 15, 1996, the day her children returned to DCF. She testified that she did not have a romantic relationship at that time, but that her emotional state required that she stay with K. In October, 1996, she gave up her apartment and the romance with K. blossomed. By March, 1997, the relationship had dissolved. K. had an extensive criminal record and was arrested again. This was the time period of mother's suicide attempt. On April 17, 1997, mother reported to DCF an instance of domestic violence with K. and claimed serious injuries. K. was incarcerated as a result of this incident. Mother has always stated that her involvement with K. had nothing to do with her August 13, 1996, decision to call DCF about her children. Dr. Mantell believes otherwise, as is CT Page 6350 discussed below. There is no question that K.'s identity was not disclosed to DCF until November, 1996. Obviously DCF would have disapproved of her living arrangements and her judgment in the earlier part of 1995, had DCF known that she was associating with K.
Mother was quite insistent in August, 1996, that she would now permit the termination of parental rights. She told DCF that she herself had been through foster care and did not want her children to languish as she had. Adoption was clearly the best result. This attitude by mother continued well into the Spring of 1997. When she told DCF about the assaults by K. against her, she stated: "Thank God the kids were not with me, I can only imagine what would have happened if I had them with me." During the time period after August, 1996, visitation decreased, and telephone calls to the children stopped, with mother telling DCF that she was "distancing herself."
A "good-bye" visit was held between mother and her children on January 3, 1997.[4] At that time mother told her children that she would no longer be part of their lives. Mother has not seen or contacted the children since the goodbye visit. Counseling was set up by DCF for the children. Sharon Stackpole of United Community Services met with the children over a six-month period ending in August, 1997, so that they might deal with grief and loss issues and fit better into their foster placement.
Mother never signed consent papers regarding termination of parental rights, tendered by DCF in early 1997. A pro forma
denial was entered for her in the TPR proceeding pending as of February, 1997. Then in May, 1997, she told DCF that she was interested in visiting her children. In June, 1997, she informed DCF of her current position that she wanted to reunify with the boys. Since the goodbye visit had taken place, DCF declined to institute new visitation on hearing of mother's changed position. Mother never followed up with a motion to the court or made use of the DCF administrative process to obtain a review of DCF's refusal to reinstate visitation.
Mother, children and foster parents met with Dr. David Mantell, a clinical psychologist, on August 12, 1997, subsequent to the time mother was again opposing the TPR. He was given expert status by the court in the areas of clinical psychology and child abuse and neglect. His report to the court has been made Exhibit 1. Biological father, although on notice, did not appear for the interview. Also, Dr. Mantell concluded that it was CT Page 6351 not appropriate to have an interactive visit between mother and the children as he was aware of the goodbye visit of January 3, 1997. He concluded that there would be psychological harm from renewed contact between mother and the children, and he did not act in a role that would allow for continued therapy after this visit. He concluded that the court should decide whether such an interview were appropriate only if the TPR petition were denied.
Having interviewed the parties, Dr. Mantell concluded that mother had made a bad bargain in August, 1996. She had decided to live with K. without her children and had tendered them back to DCF. Now that her situation with K. had collapsed, mother sought to return to the children. According to Dr. Mantell, this result would be harmful for the children, however, who had been in foster care for over one year. The children have now bonded with the foster parents. In addition, the mother's very act of giving up the children to be with K. shows that mother is not a responsible parent. She is not entitled to any additional time to rehabilitate. Dr. Mantell also noted that mother had described her conditions in August, 1996, when she decided to give the children up for the second time, and May, 1997, when she changed her mind and opposed the TPR as near collapse. Dr. Mantell relates that she did not find her treatment for a suicide attempt in 1997 helpful and would not discuss her psychological condition.
The DCF social workers and their social studies, Exhibits 2-5, indicate that the children are now living together in a legal risk adoptive foster home. The children are now bonded to the foster family and are living well, receiving appropriate education, and are in good health. The best outcome for the children would be adoption by the foster parents.
ADJUDICATION[5]
The court finds by clear and convincing evidence, as of December 2, 1997[6], that DCF must prevail against father on the three grounds urged at trial-abandonment, failure to rehabilitate and no on-going parent relationship. Here, the children have been abandoned by father in the sense that he failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of his children. General Statutes § 17a-112 (c)(3)(A). This ground focuses on the parent's conduct. Abandonment occurs on failure to maintain a reasonable degree of interest, concern or responsibility as to CT Page 6352 the welfare of the children. This is a factual matter of evaluating the parent's expressed concern for the children, and the minimum duties of parenthood, such as attempts at visitation, contact with the child through telephone calls, the sending of cards and gifts, and the provision of financial support. In reReyna M., 13 Conn. App. 23, 36-37, 534 A.2d 897 (1987); In reLuke G., 40 Conn. Sup. 316, 323, 323 A.2d 1054 (1985). As indicated, father has failed to show the interest required by a parent in the welfare of his children. Since early 1996, he has not visited with the children, provided cards or gifts or attempted to keep up with the children's welfare. His occasional telephone calls to DCF, or declarations in court, indicating his intentions to reunify have never been pursued. This constitutes abandonment for the purposes of a petition to terminate parental rights.
Father has failed to rehabilitate himself as required by General Statutes § 17a-112 (c)(3)(B). The children had been committed as neglected on January 26, 1996, and, on December 2, 1997, father had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, he could assume a responsible position in his children's lives. Father did not successfully complete the substance abuse program in which he was enrolled. He did not appear and present evidence in court that he was drug free. In addition, the failure to meet expectations is evidence of a failure to rehabilitate. In re Shavoughn K.,13 Conn. App. 91, 100, 543 A.2d 1243 (1987). Father failed to comply, or relate to DCF that he had complied, with the visitation, counseling requirements and the no-contact orders of the court-ordered expectations. Father cannot, on this record, resume a constructive and useful role as a parent in any reasonable time.In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986).
Finally, father has failed to maintain an on-going parent-child relationship, General Statutes § 17a-112 (c)(3)(D). The children have negative memories of their father hitting them and no positive memories. It would not be possible, through an additional grant of time, for father to improve or restore the situation. In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993).
With regard to mother, the court finds, by clear and convincing evidence, that as of December 2, 1997, mother had abandoned the children and had also failed to rehabilitate herself.[7] The ground of abandonment under General Statutes § 17a-112 (c)(3)(A), as indicated above, requires the court CT Page 6353 to focus on the parent's conduct. In re Michael M.,29 Conn. App. 112, 121, 614 A.2d 832 (1992). The parent must maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. In re Reyna M., supra. Here, mother has had two incidents of surrendering the children to DCF. After the first incident in November, 1995, she cooperated with DCF in an effort to regain the children. After the second incident in August, 1996, she decided that she would distance herself from her children, attended a goodbye visit in January, 1997, and had no contact with the children from the January time period. She made no effective effort to visit the children, even after she had changed her mind about the TPR petition in May, 1997. Her actions constitute abandonment for the purposes of this TPR action.
Mother also failed to rehabilitate herself under General Statutes § 17a-112 (c)(3)(B). Dr. Mantell has reported to the court that mother has failed her basic function as a parent by tendering her children back to DCF on August 15, 1996, on the day that she moved in with her boyfriend K. This indicates to Dr. Mantell that rehabilitation after the commitment for neglect has not occurred and that no further time to restore her parenting abilities is appropriate. See In re Luis C., 210 Conn. 157, 166,554 A.2d 722 (1989). The court appropriately gives great weight to the conclusion of the expert in this matter. In re Michael M., supra at 127.
Even if the court were to look to mother's stated reasons for her actions after August, 1996, essentially an inability to cope with the responsibility of caring for the children, the court would also conclude that mother has not rehabilitated herself. As indicated above, mother signed expectations, approved by the court, that she would remedy the state of her mental health before reunification might properly occur. Mother failed to follow up with her counseling at every opportunity. In May, 1996, she did not seek after-care counseling. In August, 1996, she refused DCF's offer of assistance when she was in her severe crisis. In January, 1997, she did not attend scheduled psychiatric treatment, and in March, 1997, she did not seek further help after her hospitalization. She has described herself as in a state of breakdown at various times from 1995 to December, 1997. Such actions show a failure to rehabilitate to the degree that she may resume the parental role. Viewing the facts in this manner, DCF's tender of the children in July, 1996, followed by their return in August 15, 1996, substantiates her CT Page 6354 failure. In re Luis C., supra; In re Christina V.,38 Conn. App. 214, 221, 660 A.2d 863 (1995).
The court has therefore found adjudicatory grounds as regards both father and mother. The court also finds by clear and convincing evidence that the facts warranting adjudication have existed for more than one year prior to the filing of the petition.
ATTORNEY FOR MARTY W.
Mother maintained that she was not satisfied with the legal assistance that she received from her prior attorney. The court has jurisdiction to respond to this allegation only in the context of the procedure required of the Superior Court for Juvenile Matters. The neglect case against mother was her first contact with this court. On January 26, 1996, mother appeared in Willimantic and admitted to the charge of neglect. The court record and mother's testimony confirm that at that hearing she waived her right to an attorney, but at the same time applied to the court for a court-appointed attorney. That same day she was found eligible, based upon her financial affidavit, and an attorney was appointed for her. This attorney did not appear at the extension hearing held on December 6, 1996, but he, or a stand-in, appeared at all times until September, 1997, when he was replaced by mother's current attorney.
General Statutes § 46b-136 requires that an attorney be appointed for the parent (here, mother) if the interests of justice require, even in the absence of a request. Practice Bk. § 34-1(a) requires advisement of the right to counsel and § 34-1(b) requires the appointment of counsel, when appropriate. Practice Bk. § 33-1(c) requires a canvass regarding counsel when a plea is taken at the adjudicatory stage. Here, mother waived her right to counsel, as is permitted in § 33-1(c), at her admission to neglect on January 26, 1996. Her counsel was present at all other times except at the extension hearing of December 6, 1996. On that date, mother was in agreement with termination and favored extension. She stated in a subsequent letter of September 16, 1997, sent to this court, that she did not believe her attorney was needed in these early proceedings. The transcript of the December 6, 1996, proceeding indicates that mother agreed to represent herself. In addition, an extension of commitment by § 33-9 is not adjudicatory, so that the court was not required to inquire whether counsel was CT Page 6355 waived before the extension is approved. The court finds that mother's rights to an attorney were not violated in the juvenile proceedings. See In re Bobby Jo S., 10 Conn. App. 36,521 A.2d 219 (1987) (actions of respondent justify finding that right to counsel was satisfied).
DISPOSITION
Having found that the grounds exist for termination of parental rights, the court must now consider the appropriate disposition. Here, the focus is not on the parents, but on the best interests of the children. The court may consider the evidentiary time-frame up to the present. In re Tabitha P., supra
at 367. The following are the required findings of General Statutes § 17a-112 (e):
1. Appropriate and timely services were provided to father and mother by DCF, including psychological counseling, transportation assistance, parenting, anger management, substance abuse and domestic violence counseling, and visitation coordination. The specifics of the assistance are discussed above.
2. The court finds that DCF made reasonable efforts to reunify the biological parents with their children, given the situation and circumstances discussed above. Father never took full advantage of DCF's efforts. He did not complete any of his recommended counseling programs and terminated all visitation after March, 1996. He has occasionally expressed to DCF interest in reunification, but has never followed up on his brief conversations. Mother made an attempt in 1996 to follow DCF's reunification efforts, but failed, and then gave up all further attempts to accept DCF assistance. She still has not resolved her mental health and financial issues which led to the commitment three years ago.
3. DCF, with the approval of the court, set reasonable and realistic expectations in order to reunify the family. Father failed to comply with expectations. Mother initially complied, but then failed to comply with the expectations, especially those involving individual counseling.
4. The children have strong emotional ties with their foster family, no ties with the biological father, and few brief remembrances of their biological mother. CT Page 6356
5. Matthew is seven and Shawn is five.
6. Father made no effort to adjust his circumstances, and mother was unable, due to her lack of parenting abilities, to conform her conduct to acceptable parental standards. Giving them additional time would not likely bring their performance as parents within acceptable standards to make it in the best interests of the children to be reunited. The court relies upon the failure of father to contact his children at all from March, 1996, the failure of mother to have the sustained ability to parent, and the nature of the foster parents' contacts where bonding has occurred.
7. While parents means were limited, economic factors did not prevent regular, continued contact with the children or the foster parents. All parties lived in reasonable geographic proximity. DCF encouraged contact between father, mother and the children and provided services in light of the biological parents' financial status. No unreasonable conduct by DCF occurred; indeed testimony indicated that DCF acted quite reasonably under the circumstances of this case.
The court notes that the children's attorney has recommended immediate termination of parental rights. The court further notes that neither mother nor father is capable of taking these children into their residences today. Mother was, as of May 8, 1998, in an extremely small apartment, not working and on town assistance. (Social Study, Exhibit 5)
The court finds, based upon the testimony and evidence presented, that it is in Matthew's and Shawn's best interests to terminate the parental rights of Harry and Marty W. to them. These findings are made after considering these children's needs, the length of time they have been separated from their family of origin, their need for a secure and permanent environment, the relationship that they have with their foster parents, and the totality of circumstances surrounding their short lives.
The children witnessed several instances of domestic violence, were placed in foster care twice, and were returned to DCF by their biological mother when her emotional state "hit bottom." They are now ready for permanency in their lives. Their current foster parents have given the children an opportunity for healthy development. Now is the time for the children to seize upon this chance. In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1991) (time is of the essence in juvenile placements). CT Page 6357
ORDER
Based upon the foregoing findings, the court determines that it is in Matthew's and Shawn's best interests for a termination of parental rights to enter with respect to the biological parents, Harry and Marty W. and it is ORDERED that the parental rights of Harry and Marty W. are terminated. DCF is hereby appointed the statutory parent. A permanency plan for both children shall be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
HENRY S. COHN, JUDGE CHILD PROTECTION SESSION
[2] Father was not listed on the birth certificate for Matthew, but has acknowledged paternity. He is listed on the birth certificate for Shawn.
[3] Services to mother made available by DCF are detailed in Exhibit 9. They include, in 1995-1996, United Services for family and individual mental health and substance abuse counseling, children's counseling, drug screens, domestic violence, battered women's support; legal assistance; transportation assistance; visitation coordination; East Conn. Start Program; in 1996-1997 mental health and domestic violence counseling and referrals in Norwich; Info-line information regarding daycare in 1996-1997; CT Access/covenant care/NEAC and WAIM for information on furniture; WIC; Title 19; food stamps; referral to DSS for daycare reimbursement assistance; mental health funding in 1996; DCF provisions for daycare for one week in August, 1996.
[4] At this time a goodbye visit was also conducted by DCF with the children and maternal grandmother.
[5] No finding is necessary pursuant to General Statutes §17a-112 (c)(1), because the court has made findings on December 6, 1996, November 20, 1997, and December 16, 1997, that efforts to reunify were not appropriate. See General Statutes § 17a-110
(b).
[6] "In the adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment." Practice Bk. § 33-3 (a)(1998); In re Tabitha P.,39 Conn. App. 353, 367 (1995) (emphasis added).
CT Page 6358
[7] The court does not believe that there is sufficient evidence regarding mother to terminate her parental rights on the ground of failure to maintain an on-going parent-child relationship. Matthew has expressed positive memories of his mother and Shawn has generally followed along with Matthew's views.